COLIN R. HAGAN
(CA BAR #298591)
COLIN.HAGAN@SLGLAWFIRM.COM
SHLANSKY LAW GROUP, LLP
228 Hamilton Avenue, 3rd Floor
Palo Alto, CA 94301
Phone: (650) 238-5433
Fax:    (866) 257-9530

Attorney for Plaintiff
RVision, Inc.

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RVision, Inc., | ) CASE NUMBER **'15CV685 JLS WVG** |
| | ) |
| Plaintiff, | ) |
| v. | ) **COMPLAINT** |
| | ) **DEMAND FOR JURY TRIAL** |
| FLIR Systems, Inc., | ) |
| | ) |
| Defendant. | ) |
| _____ | ) |

For its Complaint against Defendant FLIR SYSTEMS, INC. ("Defendant," or "FLIR"), Plaintiff RVISION, INC. (Plaintiff, or "RVision"), hereby alleges:

## INTRODUCTION

1. This is an action for breach of contract arising out of FLIR's refusal to accept conforming goods pursuant to a purchase order for bespoke units of RVision's Carbide 150 unit and related equipment.

2. RVision is a manufacturer of video products and physical security solutions for the government and private sectors, and is the manufacturer of certain mounting units and pan-and-tilt

**COMPLAINT; DEMAND FOR JURY TRIAL**

systems, including the Carbide 75 and the Carbide 150. RVision is a subsidiary of Cobham plc ("Cobham").

3.   FLIR is also a manufacturer and marketer of certain surveillance and imaging equipment for the government and commercial industries. FLIR's dealings with RVision also involved a subsidiary of FLIR known as ICx Tactical Platforms ("ICx"), with operations in Stillwater, Oklahoma, and Alpharetta, Georgia (FLIR and ICx are collectively referred to as "FLIR").

4.   Beginning in early 2011, FLIR and RVision began negotiating with regard to the design and manufacture of customized camera mounting units for use as a component in a system that FLIR was producing for its prime contract customer, the U.S. Customs and Border Patrol (the "CBP").

5.   During this period, RVision sent design engineers to FLIR's facility in Alpharetta, Georgia, to consult on custom designs for the units to be used as components of the CBP's order with FLIR.

6.   In April 2011, FLIR sent a Purchase Order to RVision, identified as Purchase Order No. P0007969 (the "Initial Purchase Order"), pending the negotiation of terms and conditions to govern the purchase orders between RVision and FLIR. This Purchase Order was part of an initial set of orders of RVision products by FLIR to facilitate testing and customization. As part of the Initial Purchase Order, FLIR ordered six Carbide 75 units and related equipment.

7.   In June 2011, FLIR sent a second Purchase Order to RVision, identified as Purchase Order No. P0008383 (the "Second Purchase Order"). In the Second Purchase Order, FLIR ordered two Carbide 150 units and related equipment.

**COMPLAINT; DEMAND FOR JURY TRIAL**

2

8. In August 2011, RVision and FLIR entered into a set of negotiated terms and conditions with regard to materials and products to be supplied by RVision (the "Terms and Conditions"). A true and correct copy of the Terms and Conditions are submitted herewith at Exhibit A.

9. On or about October 20, 2011, RVision sent a Price Quotation to FLIR, referenced as Quotation ETC.10202011.1850-3 (the "Quotation"). A true and correct copy of the Quotation is submitted herewith at Exhibit B.

10. On or about November 1, 2011, FLIR sent RVision its Final Purchase Order, identified as Purchase Order No. P0009103 (the "Purchase Order"). A true and correct copy of the Purchase Order is submitted herewith at Exhibit C.

11. The Purchase Order was subject to the Terms and Conditions.

12. The Purchase Order included orders for 35 customized Carbide 150 units, along with associated materials and equipment, for a total cost of $1,183,420.00.

13. RVision and FLIR had spent several months designing and customizing the Carbide 150 units for FLIR's use.

14. FLIR accepted three shipments of the Carbide 150 units, along with associated materials and equipment, but then unexpectedly put a "hold" on the remaining shipments in December 2011.

15. At no time did FLIR indicate that there was any problem with the units it had accepted or that the units were being rejected for non-conformance or otherwise. Rather, FLIR indicated that its customer's schedule had slipped, and, therefore, it had to adjust the production schedule.

**COMPLAINT; DEMAND FOR JURY TRIAL**

16. Through January and February 2012, FLIR kept this "hold" in effect, refusing to accept the remaining shipments.

17. On March 26, 2012, counsel for FLIR sent a letter to RVision purporting to cancel the remainder of the Purchase Order. A true and correct copy of the March 26, 2012, letter from FLIR is submitted herewith at <u>Exhibit D</u>.

18. The purported cancellation was effective immediately, not subject to any "hold."

19. At that time, the outstanding balance of the materials ordered in the Purchase Order was approximately $704,000.00.

20. Currently, RVision has 18 bespoke Carbide 150 units in storage, along with related materials and equipment, that FLIR has refused to accept, and which RVision has not been able to scrap or resell.

## PARTIES

21. Plaintiff RVision, Inc., is a Nevada corporation registered to do business in California, and maintains its principal place of business at 2445 Fifth Avenue, Suite 450, San Diego, California 92101. RVision also has a manufacturing facility located at 2365 A Paragon Dr., San Jose, California 95131.

22. Defendant FLIR Systems, Inc., is an Oregon corporation with its principal place of business at 27700 SW Parkway Ave., Wilsonville, Oregon 97070. FLIR is also registered to do business in California (Entity No. C2497692).

## JURISDICTION

23. Jurisdiction is conferred on this Court by 28 U.S.C. § 1332. The parties are citizens of different states, and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

**COMPLAINT; DEMAND FOR JURY TRIAL**

24. Venue is proper in this district and division pursuant to 28 U.S.C. § 1391(b) because the acts and occurrences that gave rise to this dispute occurred substantially in this district.

## FACTUAL ALLEGATIONS

### The Terms and Conditions

25. RVision and FLIR entered into the Terms and Conditions in August 2011, and on November 1, 2011, FLIR issued the Purchase Order for 35 bespoke Carbide 150 units, along with associated materials and equipment.

26. The Terms and Conditions include the following provisions:

   a. The "terms and conditions, the order they accompany, and all documents named in that order . . . comprise the parties' complete contract for the sale of items identified in the order . . . ." Terms and Conditions, § 1.

   b. "Buyer shall have a reasonable time, of not more than thirty days, after receipt to inspect Goods." *Id.* § 3.

   c. "If required by Buyer's governmental customer pursuant to its Prime Contract, Buyer may make changes in the character or quantity of the Goods, or in the manner or time of performance of this Purchase Order. Buyer's changes must be communicated to Seller in writing signed by a duly authorized representative of the Buyer. Any change in the character of the Goods shall be mutually agreed or the Purhcase Order may be terminated for convenience under clause 11. An equitable adjustment in the price and time for performance will be made by the parties in writing if such changes result in a decrease or increase in the Seller's cost or time of performance. Seller shall make no change or revision without Buyer's prior written consent, and any change requested by Buyer shall be subject to review by Seller for impact on Seller's warranty. No claim by Seller for an adjustment in the price or in the time of performance shall be considered unless presented to Buyer in writing within fifteen (15) days after Seller learns of the claim." *Id.* §12.

   d. "[E]ach party's aggregate Liability as defined in clause 13.8, under each contract will be limited to an amount equal to the greater of 115% of the amount of the value of the Purchase Order under that contract or $15,000.00." *Id.* § 13.2.

    e. "If either party fails to comply with any material provision of this Purchase Order and, after written demand by the non-defaulting party, fails to diligently comments to cure such default within 10 days of such demand . . . the non-defaulting party shall have the right, in addition to any other rights or remedies it may have under this Purchase Order, to terminate this Purchase Order for default.  Upon default termination, the defaulting party shall be liable to the other for all costs incurred by the non-defaulting party in effecting completion of performance of this Purchase Order." *Id.* § 22.

    f. "This contract shall be governed by the laws of the State of Virginia, excluding its conflict of law rules." *Id.* § 23.

### The Purchase Order and Shipments

27. After FLIR issued the First Purchase Order and Second Purchase Order, FLIR Issued the Purchase Order for 35 customized Carbide 150 units along with associated materials and equipment.

28. On or around November 21, 2011, RVision shipped four of the Carbide 150 units, along with associated materials and equipment, according to a shipment schedule set forth in the Purchase Order.

29. On or around December 16, 2011, RVision shipped another six of the Carbide 150 units, along with associated materials and equipment, according to a shipment schedule set forth in the Purchase Order.

30. On or around December 20, 2011, RVision shipped another five of the Carbide 150 units, along with associated materials and equipment, according to a shipment schedule set forth in the Purchase Order.

31. At no time did FLIR reject any of the units received from the shipments on November 21, 2011; December 16, 2011; or December 20, 2011.

6

**COMPLAINT; DEMAND FOR JURY TRIAL**

**FLIR Puts a "Hold" on Further Shipments**

32. On December 21, 2011, after FLIR had accepted at least three separate shipments of the Carbide 150 units, along with associated materials and equipment, Joe Phillipone ("Mr. Phillipone"), the Purchasing Manager for FLIR, sent an e-mail to RVision staff notifying RVision that FLIR was putting a "hold" on all further shipments. Specifically, Mr. Phillipone wrote that "[e]ffective today, 12.21.11 the remaining items, on FLIR purchase order P0009103 must be put on hold. Our customer schedule has slipped and therefore caused us to adjust our production schedule which will result in establishing future delivery dates for the items currently on order. We expect to have the review completed on 01.21.12 and will respond to you shortly thereafter. Any shipments received before these newly established delivery dates will be refused and returned." (the "December 21st E-mail"). A true and correct copy of the December 21st E-mail is submitted herewith at Exhibit E.

33. On January 6, 2012, Rolando Corpuz ("Mr. Corpuz"), Director of Operations for RVision, responded to the December 21st E-mail. Mr. Corpuz notified Mr. Phillipone that the "majority of the parts/components for your order are in inventory. I am continuing with my Production schedule as planned. We will wait for your shipping instructions." (the "January 6th E-mail"). A true and correct copy of the January 6th E-mail is submitted herewith at Exhibit E.

34. Mr. Phillipone responded, "I will know by the end of this month." See Exhibit E.

35. Mr. Corpuz wrote to confirm, "Joe, So it is definite that you are not taking any deliveries this month [?] If this is the case, I have to revise my revenue outlook to Corporate." Id.

36. Mr. Phillipone confirmed, "We will not be accepting any supplier shipments for the MSC program in January 2012." Id.

**COMPLAINT; DEMAND FOR JURY TRIAL**

37. The same day, on January 6, 2012, Trey Cammer, Senior Vice President of RVision, notified Mr. Phillipone that RVision's "inventories have been stocked to accommodate your order." *Id.*

38. Mr. Phillipone then notified Mr. Cammer that FLIR was meeting with its customer on January 21, 2012, and "hope[d] to have an updated production schedule the following week." *Id.*

39. On January 30, 2012, after having no further communication from FLIR, Mr. Corpuz followed up with Mr. Phillipone, notifying him that RVision had "$704,000 left in the books that are due to ship this month." *Id.*

40. On February 6, 2012, Mr. Phillipone reverted to Mr. Corpuz, writing, "I do need to ask the RVision team to continue to HOLD this PO until further notice. We remain in discussion with our customer." *Id.*

41. On February 16, 2012, having heard nothing further from FLIR, Jack Greene ("Mr. Greene"), then Director of Contracts and Commercial for Cobham Aerospace & Security (an affiliate of RVision), sent a notice of default to Mr. Phillipone's attention by letter, pursuant to Section 23 of the Terms and Conditions.

42. On February 24, 2012, Mr. Phillipone responded by letter. Mr. Phillipone specifically disputed the default, responding that FLIR's "governmental customer ha[d] delayed the period of performance pursuant to its Prime Contract and thereby, [FLIR had] delayed the delivery of the remaining products . . . . This action was authorized by Section 12 of the agreed terms and conditions of the Purchase Order." (the "February 24th Letter"). A true and correct copy of the February 24th Letter is submitted herewith at Exhibit F.

43.     On March 26, 2012, counsel for FLIR sent a letter purporting to terminate the Purchase Order. (the "March 26th Letter"). See Exhibit D.

44.     The March 26th Letter averred that "[b]ased upon modifications in order to fulfill the requirements of our Prime Governmental Contract, these products are no longer suitable for incorporation into the deliverables under said prime contract." See Exhibit D.

45.     At no time up to this point did FLIR provide RVision with a copy of any alleged modification that would authorize a change in the production schedule under Section 12 of the Terms and Conditions. Nor did FLIR cite any legitimate basis or contractual provision as justification.

### FLIR Later Alleges the Products Were Non-Conforming

46.     Beginning in May 2013, FLIR and RVision, through counsel and otherwise, entered into a lengthy and often delayed attempt to settle the dispute amicably.

47.     Without revealing any inadmissible settlement communications, on August 26, 2013, for the first time, John Williamson ("Mr. Williamson"), FLIR's General Counsel and Vice President of Contracts, averred that, as a matter of fact, in December 2011, more than a year and a half prior, the CBP had determined that one or more of the systems that FLIR had delivered to the CBP had failed testing for conformance with the CBP's requirements. Mr. Williamson then stated that FLIR had tested the systems and determined that the pan-and-tilt function of the units that RVision supplied allowed for too much "backlash" in rotating the camera payload, and that the alleged "backlash" was 100 times greater than anticipated.

48.     Upon information and belief, and based on documentary evidence in RVision's possession, the allegation that the RVision units exhibited "backlash" is based on notes from a field test conducted in or around January 2011, well before FLIR instructed numerous modifications to

**COMPLAINT; DEMAND FOR JURY TRIAL**

customize the RVision Carbide 150 units, and well before FLIR accepted at least three shipments of the Carbide 150 units, along with related materials and equipment.

49. At no time prior to Mr. Williamson's August 26, 2013, letter did FLIR notify RVision of any alleged non-conformance regarding the pan-and-tilt function of the units shipped under the Purchase Order. Nor did FLIR offer RVision any opportunity to inspect or cure the allegedly non-conforming units.

50. To the contrary, the units conformed to the design specifications that FLIR and RVision had developed throughout calendar year 2011, and which FLIR had modified repeatedly.

51. Upon information and belief, and based on documentary evidence in RVision's possession, FLIR prompted the CBP to issue a modification that replaced the selected RVision units with units manufactured by FLIR.

52. Upon information and belief, and based on documentary evidence in RVision's possession, the CBP issued no modification to its contract with FLIR until May 16, 2012, nearly six months after FLIR alleged that the CBP had slowed the production schedule, and two months after FLIR cancelled the Purchase Order on the purported basis of an extrinsic contract modification by its governmental customer. *See* Exhibit D.

53. Upon information and belief, the suggestion that the CBP instructed modifications that necessitated replacing the RVision products with products manufactured by FLIR was an excuse by FLIR to enable it to use its own products in fulfilling the order placed by the CBP instead of the customized products, and related equipment, that it had ordered from RVision.

**COMPLAINT; DEMAND FOR JURY TRIAL**

## RVision Attempts to Mitigate Damages

54. Following FLIR's "hold" and ultimate putative cancellation on the Purchase Order, RVision has not had many orders for the Carbide 150 and, therefore, has not had significant opportunity to mitigate its damages.

55. Moreover, the units ordered by FLIR in the Purchase Order were bespoke and highly customized.

56. Since FLIR purported to terminate the Purchase Order, RVision has had an opportunity to rework two of the customized Carbide 150 units that FLIR had ordered.

57. Each unit took 16 hours of manufacturing labor to rework, each at a cost of $6,000.00, plus materials. This does not include overhead and the engineering time needed to redesign the units back into off-the-shelf units.

58. Currently, Cobham has 18 of the customized Carbide 150 units remaining in storage in San Jose, California.

## FIRST CAUSE OF ACTION
### (BREACH OF CONTRACT)

59. Plaintiff realleges and incorporates by reference all previous paragraphs of this Complaint as if fully set forth herein.

60. RVision and FLIR entered into negotiated Terms and Conditions. RVision and FLIR also exchanged a Price Quotation and a Purchase Order. Together these documents comprise a contract for FLIR's purchase of 35 bespoke Carbide 150 units, along with related materials and equipment. *See* Exhibit A, Exhibit B, and Exhibit C.

61. FLIR contracted to purchase all of the items listed in the Purchase Order, for a total purchase price of $1,183,420.00. Exhibit C.

11
**COMPLAINT; DEMAND FOR JURY TRIAL**

62. RVision fully performed by designing, engineering, manufacturing, and assembling all of the units ordered by FLIR and reflected in the Purchase Order. Exhibit C.

63. FLIR breached its contract with RVision when it purported to "hold" and later cancel the Purchase Order, refusing to accept shipment of 20 customized Carbide 150 units, along with associated materials and equipment.

64. In purporting to "hold" and later cancel the Purchase Order, FLIR failed to comply with the provisions of Section 12 of the Terms and Conditions.

65. In particular, FLIR purported to "hold" and later cancel the Purchase Order, without justification, nearly six months before the CBP issued any modification to FLIR's prime contract, as would have been required for any valid justification under Section 12 of the Terms and Conditions.

66. FLIR had no proper basis for purporting to "hold" and later cancel the Purchase Order.

67. Although FLIR later alleged that the goods supplied to FLIR by RVision were non-conforming, FLIR never provided RVision any opportunity to inspect the goods or attempt to cure any alleged defect.

68. RVision has suffered damages exceeding $723,000.00, consisting of the remaining inventory that FLIR refused to accept under the Purchase Order, and in ongoing storage costs for the remaining 18 customized Carbide 150 units, along with related materials and equipment, since December 2012.

WHEREFORE, Plaintiff prays that this Court award Plaintiff the following relief:

    a. Enter judgment in favor of Plaintiff;

    b. Award Plaintiff its damages of approximately $723,154.00;

**COMPLAINT; DEMAND FOR JURY TRIAL**

    c.  Award Plaintiff 115% of its damages, as provided under Section 13.2 of the Terms and Conditions;

    d.  Award Plaintiff statutory pre-judgment interest of six percent per annum, pursuant to VA Code §§ 6.2-302, 8.01-382;

    e.  Award Plaintiff its attorneys' fees, as provided under Section 26 of the Terms and Conditions; and

    f.  Award Plaintiff such additional relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff requests a jury trial on all issues of fact raised by this Complaint.

DATED: March 26, 2015

Respectfully submitted,

SHLANSKY LAW GROUP, LLP

By:   /s/ Colin R. Hagan
      Colin R. Hagan (B<small>AR</small> #298591)
      SHLANSKY LAW GROUP, LLP
      228 Hamilton Avenue, 3rd Floor
      Palo Alto, CA 94301
      Phone: (650) 238-5433
      Fax:   (866) 257-9530
      E-mail: Colin.Hagan@slglawfirm.com

**COMPLAINT; DEMAND FOR JURY TRIAL**